DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, James Page, appeals from the decision of the Summit County Court of Common Pleas which convicted him of robbery and sentenced him accordingly. This Court affirms.
 I. {¶ 2} On March 31, 2003, appellant was indicted for one count of robbery, a felony of the third degree. Appellant pled not guilty to the charge and the case proceeded to a jury trial on July 24, 2003. After hearing all the evidence, the jury convicted appellant of robbery; the trial court sentenced him to three years' incarceration, with credit for time served, on July 30, 2003.
 {¶ 3} Appellant timely appealed his conviction, setting forth two assignments of error for review.
 II. FIRST ASSIGNMENT OF ERROR
"Appellant's conviction of robbery was contrary to the manifest weight of the evidence."
 {¶ 4} In his first assignment of error, appellant argues his conviction was against the manifest weight of the evidence. This Court disagrees.
 {¶ 5} When a defendant asserts that his conviction is against the manifest weight of the evidence,
"an appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." State v. Otten (1986),33 Ohio App.3d 339, 340.
This discretionary power should be invoked only in extraordinary circumstances when the evidence presented weighs heavily in favor of the defendant. Id.
 {¶ 6} In this case, appellant was convicted of robbery, in violation of R.C. 2911.02(A)(3), which provides: "No person, in attempting or committing a theft offense or in fleeing immediately after the attempt or offense, shall * * * [u]se or threaten the immediate use of force against another."
 {¶ 7} The State presented numerous witnesses at trial. Jack Sorkin, the victim, testified that he was a taxi driver and on January 13, 2003, he was dispatched to a house located at 208 Barder Avenue. Mr. Sorkin arrived at the house around 11:30 p.m. and picked up two white men and one black man and drove them to the Party Time Lounge on East Market Street. He stated that when he dropped the men at the Party Time Lounge, they paid his fare and the black man asked him to return in one hour and pick them back up again. Mr. Sorkin testified that he returned to the Party Time Lounge around 12:30 a.m. to pick up the three men. After he honked his horn and the men did not come out, Mr. Sorkin went into the Party Time Lounge and found the three men. He stated that he waited about ten minutes until the three men were ready to leave and then they all got into his taxi.
 {¶ 8} Mr. Sorkin testified that he drove to Katmandu on East Market Street and dropped off the two white men, who paid him for that fare. Mr. Sorkin stated the black man wanted to be driven back to the house located at 208 Barder Avenue. While Mr. Sorkin was driving, the man told him to "Stop the cab right here" by a specific house where he claimed he needed to go to get money for the fare and he would be right back. Mr. Sorkin testified that he stopped the car and began writing on his trip sheet and the man then said "This ain't no joke" and told Mr. Sorkin "If you don't want to die tonight, you're going to give me all the money you got." He stated the man, sitting directly behind him in the taxi, grabbed his neck with both hands in a "death grip" and he was choking Mr. Sorkin. He testified that he attempted to reach for his taxi CB radio and the man told him, "No, you ain't going to grab for it" as he squeezed Mr. Sorkin's neck harder.
 {¶ 9} Mr. Sorkin testified he had $90 in his possession, but he initially threw only $30 of the money into the back seat. The man told him "Oh, no. I know you guys got more money than that. Don't make me kill you" while he squeezed harder on Mr. Sorkin's neck. He threw the rest of the money into the back seat and the man then ordered Mr. Sorkin to give him the keys to the taxi. Mr. Sorkin testified that he turned the taxi off, pulled out the keys, struggled to get free of the man's hold on him, opened his door and began running away from the man. He stated the man yelled "Don't make me shoot you", started chasing Mr. Sorkin, but then stopped pursuing him shortly thereafter. Mr. Sorkin testified he ran to Lisa's Cabaret, where he was able to call his taxi dispatcher, who in turn called the police for Mr. Sorkin.
 {¶ 10} Mr. Sorkin testified that the police arrived at Lisa's Cabaret shortly thereafter to talk with him and a fellow taxi driver drove him down to the police station because he was so traumatized from the robbery. He stated the police showed him a photo array and he picked out one of the men therein as his attacker and signed the array that night. Mr. Sorkin did not pick appellant's picture in this first photo array. He testified that a week later, after his nerves calmed and he could more clearly go over the events of the robbery in his mind, Mr. Sorkin met with Detective Reilly about the case. He was shown a second photo array and he picked out the appellant as the man who had robbed him and signed the second photo array. When asked about choosing two different men from the two photo arrays, Mr. Sorkin testified that he had looked at the first photo array when he was a scared, nervous wreck and that his identification of appellant from the second photo array was correct because he had had time to calm down, relive the robbery, and he was better able to identify his assailant at that point in time.
 {¶ 11} The State also presented the testimonies of Officer Hardman and Sergeant Simcox, who both responded to the 911 call made on behalf of Mr. Sorkin. Sergeant Simcox testified that when he arrived at Lisa's Cabaret he observed that Mr. Sorkin was an emotional mess and consequently he was hard to understand that night. He asked Mr. Sorkin to describe the man who robbed him and Mr. Sorkin told him his robber was a black male, described his clothing and appearance, and explained that he had been driving the man in his taxi that night. Sergeant Simcox's testimony of what Mr. Sorkin told him happened on the night of the robbery corroborated Mr. Sorkin's testimony at trial. He also stated the information Mr. Sorkin gave him led Sergeant Simcox to send officers both to locate the taxi and to locate the two white men who had ridden with the suspect in the taxi that night.
 {¶ 12} Sergeant Simcox further testified that he also went to Katmandu and met with those two men, Richard Hardesty and Brian Regan. He stated that Mr. Hardesty told him that a black male named Blue had been with them in the taxi earlier that night, but Blue left in the taxi after they were dropped at Katmandu. Sergeant Simcox testified the two men gave him an address and a name of a woman who might know the whereabouts of Blue. Sergeant Simcox went to the address and spoke to two women at the house who told him Blue was the nickname of James Page. One woman saw Mr. Page earlier that evening and when she described what he had been wearing, her description matched Mr. Sorkin's description of the man who had robbed him.
 {¶ 13} Officer Hardman testified that he arrived at Lisa's Cabaret after Sergeant Simcox and he was ordered to locate and secure Mr. Sorkin's taxi. When Sergeant Simcox brought Mr. Sorkin back to the location of the taxi, Officer Hardman put him in the back of his cruiser. He testified that he observed Mr. Sorkin was terrified and shaky and his voice was quivering when Officer Hardman tried to talk with him. He stated he completed an incident report with Mr. Sorkin and during their conversation Mr. Sorkin told him that he had overheard the other men in the taxi say the name Blue. Officer Hardman's testimony of what Mr. Sorkin told him happened on the night of the robbery corroborated Mr. Sorkin's testimony at trial. Officer Hardman stated he completed the incident report with Mr. Sorkin and a fellow taxi driver then drove Mr. Sorkin to the police station to look at a photo array.
 {¶ 14} Detective Reilly, who was assigned to investigate the case, also testified on behalf of the State. He testified that he met with Mr. Sorkin for several hours about one week after the robbery. Detective Reilly stated he had compiled a photo array and showed Mr. Sorkin the same at their meeting. When Mr. Sorkin looked at this second photo array, he identified the appellant as the man who robbed him. Detective Reilly's testimony of what Mr. Sorkin told him happened on the night of the robbery corroborated Mr. Sorkin's testimony at trial. Detective Reilly also testified that he interviewed both Richard Hardesty and Brian Regan separately concerning the night of the robbery. He stated he showed both men the same photo array during their respective interviews and they each identified the appellant as Blue, the man who was traveling with them the night of the robbery.
 {¶ 15} The State also presented both Richard Hardesty and Brian Regan to testify as to their recollection of the events on the night of the robbery. Their testimony also corroborated the evidence that the appellant was traveling in Mr. Sorkin's taxi with them on the night of the robbery and that the appellant left alone in the taxi after Mr. Sorkin dropped them off at Katmandu.
 {¶ 16} This Court recognizes that Richard Hardesty and Brian Regan's convoluted testimonies were conflicting as to certain details concerning who said what during the taxi rides, who paid for what and when throughout the night, and what Mr. Sorkin said or did when he entered the Party Time Lounge to find the three men to drive them to their next destination that night. However, it is well settled that "the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of the facts." State v. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus. The jury in this case decided such discrepancies in the men's testimonies concerning events prior to the robbery itself did not diminish the weight of the evidence, specifically the credibility of the other witnesses, that a robbery occurred that night. This Court refuses to overturn the appellant's conviction because the trial court chose to believe the prosecution testimony in this case.
 {¶ 17} After thorough review of the record, this Court cannot conclude that the trial court lost its way and created a manifest miscarriage of justice when it convicted appellant of robbery. Appellant's first assignment of error is overruled.
 SECOND ASSIGNMENT OF ERROR
"The trial court erred in submitting, over appellant's objection, written jury instructions which included only the elements of the offense of robbery and did not include the balance of the verbal jury instructions."
 {¶ 18} In his second assignment of error, appellant argues the trial court erred in submitting, over his trial attorney's objection, written jury instructions as to the elements of the offense of robbery only, while not providing the balance of its verbal jury instructions in written form. This Court disagrees.
 {¶ 19} Crim.R. 30(A) clearly provides the trial court with discretion to decide if it will provide the jury with written instructions — as well as to what extent it will provide them — and specifically states that it "need not reduce its instructions to writing." Therefore, this Court must consider such a decision by the trial court in the instant case under an abuse of discretion standard. An abuse of discretion is more than an error of judgment, but instead demonstrates "perversity of will, passion, prejudice, partiality, or moral delinquency," Pons v.Ohio State Med. Bd. (1993), 66 Ohio St.3d 619, 621, or an arbitrary, unreasonable, or unconscionable attitude on the part of the court. Schafer v. Schafer (1996), 115 Ohio App.3d 639,642. When applying the abuse of discretion standard, an appellate court may not substitute its judgment for that of the trial court. Berk v. Matthews (1990), 53 Ohio St.3d 161, 169.
 {¶ 20} At trial, outside of the presence of the jury, appellant's attorney objected to the written jury instructions the court prepared to distribute to the jury for their deliberations. Appellant's attorney explained they wanted all of the verbal jury instructions to be provided in written form, namely the instruction as to appellant not testifying and the credibility of witnesses along with the instruction on the elements of robbery. Appellant's attorney concluded to the court that either all or none of the verbal jury instructions should be given in written form to the jury. The trial court responded as follows:
"Well, the Court during the trial twice instructed regarding credibility and so they've heard those instructions twice. And I do not believe it's necessary to send written copies of all of the standard boilerplate instructions back. I think it's necessary that the element instructions go back because those set forth with particularity what the State has to prove and I think that it is significant to the jury that they have those definitions and those elements in writing for use during deliberations."
 {¶ 21} In light of the applicable law and record in the instant case, this Court cannot find that the trial court abused its discretion when it did not provide all of its verbal jury instructions in written form to the jury. Appellant's second assignment of error is overruled.
 III. {¶ 22} Accordingly, the judgment of the Summit County Court of Common Pleas is affirmed.
Judgment affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.
Costs taxed to appellant.
Exceptions.
Slaby, J., Batchelder, J. concur.